Jennifer Miller v. Baxter Healthcare Corp. 041-5578. Good morning. If it pleases the Court, I am William Campisi Jr. and I represent Jennifer Miller and Mary Ann Vargas, who are the daughters of the decedent Mark A. Miller. This is a case about a missing 18 milliliters of morphine and whether the evidence raises a tribal issue of fact as to whether that 18 milliliters of morphine was inadvertently administered to Mr. Miller while he was in the hospital at Kaiser and Walnut Creek because of some malfunction of a piece of machinery manufactured by the defendant, or whether the morphine, the missing morphine, was removed from a syringe after Mr. Miller's death for testing. And what evidence in the record supports your position? Well, Your Honor, there are two witnesses who came forward, a man by the name of Bradley Lewis, and that's at his depositions at Exhibit 10 in the appendix, and another witness by the name of Cynthia Lagasca. Her deposition excerpts are at Exhibit 11 in the appendix. These witnesses allegedly were involved in removing the morphine from the syringe after Mr. Miller's death, this 18 milligrams of morphine. Just to go back for a second, well, in the court's order, it states that the declarations of plaintiff's experts create a genuine dispute as to the cause of Mr. Miller's death. They do not, however, create a dispute as to whether the PCA pump malfunctioned. And the court went on to say, the depositions of several Kaiser employees established that Kaiser took two samples of fluid from the syringe for testing, and each of these samples contained approximately 9 to 10 milligrams of fluid. Plaintiffs would dispute that and believe that the evidence does dispute that finding, and this is why. The one document, well, what happened is I sent a subpoena to Kaiser, and I said, produce the person who removed this fluid from the syringe, and I asked them to produce also all writings in connection with the removal of the fluid from the syringe. The laboratories in Virginia, there was a computer link between the laboratory in Virginia and the laboratory at Kaiser Walnut Creek. The samples have to be removed based on a requisition. Not only is the requisition created, but there's a log. When specimens are brought to a hospital laboratory, there's a log that's supposed to have the specimens in it. At the end of the day, a courier would come to the hospital. A package list would be created through a system of labels that were barcoded and then would be entered into the computer using a laser scanner. The courier then would take this package list, check all the specimens against the list, then take that whole big package of specimens to be tested to the Oakland airport for transport back to Virginia. So I said, bring all the writings relating to this testing from Mr. Miller. When the witnesses came to their depositions, they brought nothing. There was no requisition. There was no log from the laboratory. There was no package list. They claimed that the first sample was lost, and therefore they had to do another sample. There was no record of any contact with his laboratory in Virginia, that there was a lost sample. There was none of the ordinary business records that they say that they create when they do this activity, not a single one. Now, here's a testimony, for example, of Mr. Bradley Lewis. Mr. Bradley Lewis says, it's on page 19, lines 3 through 4, exhibit 10, quote, I don't know whether it was removed from Mr. Miller or not. I can't remember that. He says, about the requisition, he says, this is, again, page 19, the only writing would be the original requisition that we are trying to locate. So they couldn't find a requisition. On page 21, he says, no, I didn't bring any writings to the deposition. On page 34, he says, specimens are logged into the laboratory, but we have nothing in the log relating to this specimen. If you look at the actual document that they presented, which is exhibit 6 to the appendix, there is nothing on that document, not a single thing that links that particular test to Mr. Miller. There's no patient ID, and it was a little confusing, because first he said, when I asked him, that he gave the sample a patient ID. That was on page 46. But then what he said later in the deposition was, the number on the test report is not a unique number for the patient. The number on the test report is an environmental number. What are you saying? So all this evidence, in effect, impeaches his testimony that this, as far as he's concerned, this 9 milligrams was removed afterwards? Yes, there was no test. Well, wait a minute, but he testified to that, right? Pardon me? He testified to that. Mr. Lewis did testify that that happened. Right, and so you're saying all this, let's see, what should have happened, the absence of these usual circumstances effectively impeaches his testimony? Absence of ordinary business records is evidence that an event did not occur. That's Hornbook textbook law. That's exactly correct. And not only absence of ordinary business records, but here's what he said about that. You set a case for that proposition? I do in my brief. I don't have one at the top of my. But it is in your brief? It is. All right. Now, let me finish the one thing he also said about this particular document. He said, I was asking him about the contact that the hospital lab would have with AML if there was a lost sample. And he was saying, well, we would put into the computer our contacts with AML. Here's what he said, quote, If it's a patient, if it's a patient, it would go into the computer. This wasn't a patient. This was a quality control sample. And what's interesting is when they produced Exhibit 6, they produced two quality control sample test results. They produced one for February of 2001 before Mr. Miller died, and they produced one that has the same date as the date of Mr. Miller's death. That's true. And they're claiming that because it happened on the same day, then it must be for Mr. Miller. Well, I have a question about this. Yes. What evidence is there that the cause of death of Mr. Miller was an overdose of morphine rather than as a result of the level of morphine prescribed? Well. And does that match? Yes, it does. That's a very good question, and here's the answer. And this is what the defendants say. They say, well, if you look at the prescription, the amount of morphine, well, you have to know something about this machine if I can back up for a second. The machine has a 50-milliliter syringe. It's attached to the side of the machine, and there's an arm that's on a screw jack, kind of a screw jack that was on that airplane that went down in the ocean a few years back. And this arm, when you push the button, it's a patient-controlled machine, and you have this control. When you have pain, you push it.  But it's supposed to only give you a certain amount. If you have a lockout, you could get 2 milliliters every 15 minutes. So you press the button, and the arm descends and delivers 2 milliliters if the machine is functioning properly. And if you push the button other times in that 15 minutes, you can't get any more pain medication, and the machine keeps track of the number of attempts of injections, the number of injections per hour. So, the prescription was 2 milliliters every 15 minutes. That's the prescription. If the machine delivers unaccounted-for medication, that is not within the prescription. They argue, well, the prescription was for 50 milliliters. It's not 50 milliliters. It's 8 milliliters per hour, 2 milliliters every 15 minutes. I don't think you're answering Judge Gallagher's question. You're getting to some kind of malfunction. But she said if he got the prescribed dosage, right, that still could have been the cause of death. No. Because of some toxicity to morphine. No. Because of his asthmatic condition or whatever it was, right? Well, the Court – no. The only expert opinion testimony in this case was submitted by us. There was no expert opinion testimony submitted by them in support of their motion for summary judgment. My expert said it was an overdose. And I can tell you this. There's 18 milliliters that are unaccounted for. If any of us received 18 milliliters of morphine, even over a 10-minute interval, we would probably all die. Is your answer then to Judge Gallagher's question that if the decedent received nothing more than the prescribed dosage, the morphine could not have been the cause of death? Correct. Absolutely. There's no question about that. He weighed 250 pounds. Anybody can take 8 milliliters of morphine delivered over an hour. Well, you know how many times he tried to take morphine, don't you? We don't know, actually. Yeah, we do. We know how many times – how many hits were shown on the machine. Well, there's a dispute because, you see, the custody – the nurse did not record on the medical record that it's in here, that information. It was never recorded in his medical record. Subsequently, a person who was specially asked to investigate what happened took custody of the pump himself and privately kept the pump all the day of the man's death. So only he knew, really, what was on that machine, and then it was erased. So – but we've finally gotten it down to an agreement that there should have been 30 milliliters left in that syringe, and there was only 12. So 18 are missing. And what Kaiser says is, we withdrew it after his death. And these two witnesses came forward and said, we did it, but they provided none of the ordinary business records to support that. Not a requisition for the test, not any shipping documents, not any logs, nothing. They couldn't remember, and he admits he doesn't even know if it's for Mr. Miller. And the test report that they provided is not connected to Mr. Miller by a patient ID. It's an environmental number. There is no connection established. And that raises a reasonable inference that the test did not occur and that Mr. Miller accidentally received that 18 milliliters. Wait a minute. That raises the inference that the test didn't occur, but it doesn't necessarily tell you what happened to the 18 milliliters, does it? After all, you know, that wasn't, you know, the absence wasn't discovered until a couple years later, right? It could have just evaporated. No, I'll tell you why. And Mr. Sheehan dealt with that in his declaration. Well, are all possible other causes of the disappearance of 18 millimeters accounted for? Yes, because it was packaged in a plastic bag with the 8-foot tube still connected to it. It still had the plunger in it. There was no way it could evaporate. It's in a plastic. It was stored in a plastic bag. We saw it. So that 18 milliliters, that missing 18 milliliters was either taken out after his death or it went into him. There's no question about that. And the court agreed that he could have died from a morphine overdose. We presented that evidence. They didn't dispute that. What we dispute is there is the lack of any business records and the inconsistencies in this testimony creates a triable issue of fact as to whether or not there was any testing of that fluid ever done. There's no report that shows that. There's no document, not a single document, that shows that any such testing ever occurred. And even the witnesses didn't remember it. That's what it sort of boils down to, that obviously to keep this defendant, who's the appellee now, in the case, there has to be evidence against them that the pump did not function as it set out to function, correct? Yes, Your Honor. And so the issue in my mind is whether what you're presenting, whether it creates a triable issue or whether it's speculation. The pump has to count the medication delivered. If the pump does not function as it was set to function and Mr. Miller died, even of an overdose because of his particular, you know, that his body couldn't handle it, that doesn't, you know, that wouldn't lead them in. Let me say this. If the 18 milliliters was not removed post-death, the pump did not function as it was supposed to function. Because it didn't, because it Your argument would be that would create a triable issue that it did not function. I don't know whether that, because we're at summary judgment. Right. But the pump has to count the medication it delivers. If the pump delivers more medication than it is set to deliver, it's not operating the way it is and it will kill people. Several hundred or several thousand people have died. Let me ask you this. Just on a hypothetical. Yes. You know, if these nurses testified that what they did and the records supported that they removed this and all of that, would there be a triable issue? Probably not. The fact of the matter is that there's no evidence that these tests occurred. So the focus of yours, what makes it a triable issue and not speculation, is because we don't have the records to support what they said. We have a man who had symptoms of morphine intoxication. He had, he was unconscious, he wasn't breathing, and he had pinpoint pupils. There's only two things in the world that cause human beings to have pinpoint pupils, and one of them is an infarct of the brain stem, which he didn't have, and morphine. So he had classic symptoms of morphine intoxication when he was found in the medical records. Is it a factor in the autopsy that he doesn't have those levels? The issue is the time of death, because when you continue to process morphine, morphine has a half-life of two hours. So if you remain alive and your kidneys and liver are functioning, which they are, then the levels will drop to near-normal levels. These weren't normal. I think we have your argument in mind. Do you want to reserve for rebuttal? That's up to you. No, that's fine. Okay, thanks. Good morning. May it please the Court. My name is Michelle Goodman, and I represent the defendant and appellee, Baxter Healthcare Corporation. Okay. Why don't we just jump right to it from this standpoint? Because I think we're familiar with the evidence that's presented. And what I struggle with any time on a summary judgment when I have to, you know, I mean, obviously we're not supposed to be resolving factual disputes. And so any time I have to work to get over too many things, I'm telling to myself, well, does that mean that there's a triable issue? So tell me why in this situation, my argument, my understanding of his argument is there's obviously no evidence that someone examined the pump and said the pump didn't do what the pump was supposed to do. So the basis of his argument is this discrepancy of the morphing. And you present evidence saying that the nurses drew it out. He's saying there are no records to support that, and that in and of itself creates a triable issue. Why is that not true? That's not true because it ignores a very critical piece of evidence that Baxter submitted. And that is what I've referred to in my brief as the Hopkins report. The Hopkins report? Correct. And that, the place to look for that is Baxter's supplemental excerpts of record, and it's pages 171 through 174. Nurse Hopkins was asked on June 24th, 2001, the day that Mr. Miller died, to conduct a peer review investigation. He took the pump and the syringe and inspected both the pump and the syringe. He wrote down in that document, the pump has a history function, which you must be aware of from the briefing. He wrote down verbatim what information was included in that history function. And critically, he also wrote down that he observed 30 milliliters of fluid in the syringe at that time. And this was when? This was the day of Mr. Miller's death. This is June 24th, 2001. All right. And that record exists? That record exists, and it is in our supplemental excerpts of record at page, that particular page is at page 174. I believe that that particular page is not included in the plaintiff's excerpts of record, and that may very well be inadvertent because that particular page was produced later. But we have evidence that on the day of his death, when the syringe was still in the pump, it had 30 milliliters of fluid. What the plaintiff here is asking you to do is make an inference that the amount of fluid left in October of 2002, which is 18 months later when his expert examined the syringe, it's undisputed there were about 12 milliliters left. And what he's asking you to do is make an inference that that 12 milliliters is really what was in the syringe on the day of Mr. Miller's death in June 24th, 2001. But because of the Hopkins report, which specifically says there were 30 milliliters left, that is not a reasonable, justifiable, or permissible inference to make. So all of the discussion about whether liquid was removed, how much was removed, when it was removed, is really irrelevant. It is not material. Because you cannot, simply by discrediting existing evidence that is the testimony of these lab technicians, you cannot from that draw a conclusion of the opposite. And that's just... Let's say you didn't have that Hopkins report, as it were. All right. Let's say no one, and all that we had was at the end of the day we're missing a certain amount of milliliters. And then you have the nurse testify that she drew some of it out. And was it she or he? Was it the one that... Oh, there were a couple. What was it she, what was it he? That they did the draws, but there's no records. But we don't have the Hopkins report. And if that were our scenario, would that be closer to creating a tribal issue? I need to clarify your question. When you say we don't have the Hopkins report, are you referring to the entire report, including the pump history, which says... No, we have... Okay. Well, if we had the pump history, but then no one looked, no one checked what was left, you know, no one actually verified what was left at the time to... I guess the pump history, we've got the pump history of how many presses and what happened. But if we didn't have how much was left, if no one actually checked that, and then they had all of this activity out of it, then we, 18 months later, look at that. Is that closer to creating a tribal issue as opposed to speculation? It does not create a tribal issue, and this is why. The pump history states specifically what was given to Mr. Miller at what time. There is no evidence that that was inaccurately recorded, and you cannot infer from the fact that there were 12 milliliters left that the missing 18 milliliters was a result of a pump malfunction. You can't infer that it went into Mr. Miller's body. Someone could have spilled it on the floor. You cannot infer that even if it did go into Mr. Miller's body, it was a result of some problem with the pump. Well, at some point, there would have to be something someone could do by circumstantial evidence that would say that the pump malfunctioned. Yes, and apparently, Mr. McClain's expert... I mean, because at some point, when you have to start explaining too many things, then that's not for a court to resolve on summary judgment. I understand that. You know what else, too, Ms. Goodman? On the same point, you're suggesting that what the reasonable inference would be, but there are cases that you'll find that says the facts and reasonable inferences from those facts are the province of the trier fact. Correct. And I don't mean to suggest that this Court is not permitted to draw reasonable inferences, but I'm trying to define what the courts have said reasonable means. And a reasonable inference, you have to take the existing evidence. And if the existing evidence is inconsistent with an inference, that inference is not reasonable. Well, you have to take the existing evidence in the most favorable light to the plaintiff in this situation. That is correct. Following up on Judge Callahan's earlier questioning, if we put aside the Hopkins report, the explanation of the hospital is that, and I guess it would include the Baxter, is that 18 milliliters or milligrams were missing because they were taken out for testing, right? That's correct. And that's a testimony of these two people. But in Mr. Campisi's case as well, but none of the ordinary business records that accompany that type of testing were produced in this case, and so the absence of business records is evidence that the event never happened. And he cites a case for that. Now, if there were no Hopkins report, wouldn't that create an issue of fact? Because the only assertion you make is that as to why the morphine was missing is because it was sent for testing, and he disputes that. There are a lot of things in there, and I want to try to make sure that I address all of them. The first issue is just as a matter of law, the case that plaintiffs cite merely says that the absence of business records is admissible as evidence. As evidence of what? As evidence that they don't exist. Right. For example, in that case he cites, the question was whether someone had rented a car from Hertz, and Hertz checked its records, and they had no record that someone had rented a car, so therefore that's admissible evidence. I know, but that itself then gives rise to further inference, right? Well, what that does, since we have testimony, is, as I believe you noted before, Your Honor, it creates a question as to the credibility of that testimony. And credibility alone is not sufficient to raise a material, a genuine issue of fact. Is that your position? That kind of, we'll say, lack of evidence in this situation goes only to credibility? Yes. It's not substantive evidence of, say, the fact that the event never happened? You understand that? I do understand, and it is possible that, given all that, a reasonable jury could decide that the event never happened. That only goes to one of the two questions, which is, is there actually a dispute? There is a dispute. I will concede that. But what's more important is whether that dispute is material. And in this case, I think we need to step back for a minute because when plaintiff first started his argument. Well, I think you're exactly right on that, but I think it becomes more material if you didn't have Hopkins' report. Well, you know, it's. That's where I'm, that's where, that's, you know, I understand as an advocate why you never want, you don't want to ever concede anything, but at some point, you know, when you pull the pins out, at some point you have to say, well, maybe we're there. Well, I understand that. But the reason I want to step back quickly is because plaintiff's counsel has tried to frame this issue as whether or not the 18 milliliters were removed. And that's simply not the issue before this court. Plaintiffs have brought a product liability action against Baxter, claiming that the pump malfunctioned and caused more morphine to be delivered to Mr. Miller than was prescribed to him. That is the question. So he asked what he's saying. He has to show a malfunction. He has to come forward with some specific and affirmative evidence, not merely discrediting the evidence that Baxter has put forward, not merely credibility attacks, but some specific affirmative evidence that there was a pump malfunction. Well, but I think his case is this. If you can infer that this 18 milliliters or milligrams was delivered to the patient, then from that you can infer that there was a malfunction because it wasn't supposed to be delivered. Right? Isn't that his case? That is his speculation. Wouldn't that be evidence of a malfunction? Not necessarily. No? Someone could have taken that syringe and injected it into him. I know that, but you have to draw the inferences in favor of the nonmoving party. You do. That's an inference maybe you can draw, but the other inference is just as reasonable. You do have to draw the inferences in favor of the nonmoving party, but you cannot preclude summary judgment based on speculation, credibility determinations, and unjustifiable inferences. There will always be a case where someone can come into court and say, you cannot grant summary judgment because I believe that this witness is lying. Well, you agree in this case it's pretty clear something went wrong, though. I do, and to that end, I would like to address one of the questions Your Honor posed to my colleague, and that is, is there any evidence that if Mr. Miller was given the amount he was prescribed by the doctor, he still could have died from a morphine overdose? And I was quite surprised to hear Mr. Campisi say no. Right. And I would, to that end, direct the court to the expert opinions that Mr. Campisi has submitted. There are three doctors who have submitted reports. None of those doctors have opined that respiratory depression could occur only if Mr. Miller got more than he was prescribed. And, in fact, two of them say precisely the opposite. Dr. Fisher, and this is at excerpts of record tab 4, tab 14, excuse me, paragraph 5. Tab 14, paragraph 5, go ahead. Correct. In criticizing the coroner said, and I quote, the issue is to assess what is the lowest morphine concentration that can depress ventilation profoundly in a subject without prior significant opioid use. And then he goes on to state, I am not aware that such a value is available in the clinical literature, saying there is no lowest level of morphine. Similarly. What does that mean in lay terms? Any amount of morphine could be dangerous? Correct. There is no safe level of morphine, as Judge Breyer found in the district court opinion. Similarly, Dr. McAlpin, and this is excerpts of record tab 16, at page 3, says, and I quote, I conclude that Mr. Miller died of a respiratory arrest, probably related to the administration of morphine, a respiratory depressant, during an exacerbation of his bronchial asthma. The occurrence of respiratory failure induced by morphine during acute asthmatic attacks is a well-known complication of that drug's use. Dr. McAlpin also notes that Mr. Miller had asthma, he was being treated for asthma while he was in the hospital, and that he was observed wheezing during the night. What's the excerpt citation to that paragraph we just read about? It's the excerpts of record, tab 16, it's page 3. It's the conclusion paragraph, they're not numbered. That's from McAlpin? Correct. All right, thank you. I think we're going to decide the case on the record, of course, and you know where the inferences must lie as we look at what is here. And what is here, at least as I understand his best argument, should have been 30, and that was 12. You're saying the record also shows that there were 30 on the critical day. That's correct. And he is saying, if I understand correctly, if there were 30 on the critical date, there would be 32 years later, because there was no way for it to escape. The only way that it's not there is that it was somehow removed. And he says, the hospital says it was removed because you took 9 ounces, 9 milligrams, to do a test, and that was somehow misplaced, so you took 9 milligrams again, and that accounts for the 18. Correct. If you had a record showing that 9 were removed, business record, and that 9 were removed, then there'd be very little question, I think, as to whether you should prevail. It would be over. But there is no business record. Now, what do we do with the absence of the business record and the absence of the morphine, in your opinion, as we review this case? Because that's what we're going to have to look at. All of the records you're reading, that certainly would be something you'd introduce at trial. There's no doubt about that. But now we're looking at summary judgment only, and we aren't going to measure those things. We're going to look at just, I think, the things that I've just enumerated. And if that's what we're going to look at, then don't you have to tell us how we get over the absence of the business record? I would be happy to do that. First of all, there is no absence of the business record. There is – first of all, to have absence of a business record, you need evidence that a business record would have existed. One of the excerpts from Mr. Lewis's testimony that we heard earlier, he said the only record, the only written record that would have existed would have been the requisition form. If you read the testimony that we've submitted, both he and Ms. Lagoska state that when a sample is sent out, there is a carbon copy form, and they fill it out, they put it in a binder, and they have no idea what happens to that binder once it's full. The binder is in the possession of Kaiser, a third party. It is not in my possession. I, you know, plaintiff has asked for it. Kaiser has not produced it. I agree. But there is no evidence that it still exists. There is no evidence that they could have, should have, and do keep that binder, which merely says, I sent out this information. There is – they have raised other documents that they speculate might exist. Isn't your best argument that on the day that was relevant, the evidence is not disputed that there was 30 there? Yes. And that the other then becomes a red herring as to what happened from the day that Mr. Miller died until 18 months later? That is absolutely right. And that is why I had so much trouble trying to ignore the Hopkins report. But the Hopkins report says 30 milliliters. Ms. Hill, the nurse who found Mr. Miller unresponsive, testified, and her notes say there were 30 milliliters left. Her flow sheet, which you have read about, she transposed two numbers. One of those numbers, which should have been in the column that says how much morphine is left, was 28. And she has testified that – and I can find the site for you – but she has testified that when you read a syringe, depending on whether you read it at the top or the bottom, there can be about a 2 milliliter difference. So there is ample testimony, not just the Hopkins report. Ample testimony that on the day of Mr. Miller's death, there were 30 milliliters left in the syringe. There is also undisputed evidence from the pump history itself that the pump functioned precisely as it was intended. Plaintiffs have presented no evidence. Their expert inspected the pump. He has stated in other cases, I have been able to determine that a pump recorded information inaccurately or administered medication without recording it, but he does not state that that happened in this case. He does not opine even a theory of how that could have happened in this case. Nor is there any evidence that Mr. Hopkins did not, in fact, transcribe verbatim that information. And given that, I think Judge Breyer's opinion needs to be affirmed. All right. Your time is up. Thank you for your argument. Your Honor, to address the issue of the Hopkins report and whether that's disputed, the official record of what morphine is delivered to a patient must be in the patient record. And here it is. This is what was prepared by Sally Hill. And it's called Patient Controlled Analgesia Flow Sheet. It's Exhibit 7 in my appendix. If you read this on its face, there was 47 milliliters left in the syringe in the morning. This document completely disputes what Hopkins says. And apart from that, Exhibit 10, on the back page, the second page of Exhibit 10, is a page of calculations where Nurse Hill is trying to make it work out. You know, the way that you count, all you do is look at the digital readout on the machine, see what it says was given, look at the syringe, which you can see through a plastic door, and write it down. Here we have ---- Well, what we have in evidence are her calculations. That's right. And whatever inferences are appropriate from that. But her report is completely different from the Hopkins report. So a jury could easily infer that the Hopkins report is incorrect. So we have two reports on the same day, and the official report is this one. But what's the conclusion from her report as to how much morphine was left? Her report says there should have been 47 milliliters left in the syringe, not 30. But does that help you? Sure. That means more was given to him, more than 18. That would mean he received 35. But does that still mean more than what the pump was intended to do? Absolutely. The pump has a rate. See, it's a 50-milliliter syringe. If you give someone 50 milliliters of morphine, you will kill them. This goes right into the bloodstream. This is not through the muscle. This goes right in. If you gave someone 20, if we took 15, we'd probably die. If it goes directly into your bloodstream immediately. I don't want to get outside the record. Well, the rate's what's important. It's the rate. And the machine has to count the rate. You know what? That doesn't disturb me. It's your case. But I'm just interested in why you have to make this machine malfunction with all the other possibilities. Are you ruling out all other possibilities because of this? I know you have, and this record is permanent. And you've said in this record that it didn't, that, no, it wasn't this, it wasn't that, it wasn't the other. It wasn't the prescription. It's a product defect case. Now, for example, the way that there was a software that goes with this machine, Judge Callahan mentioned the issue of concentration. It's one milliliter per one milligram is the concentration, or one milligram per one milliliter. But the problem you're facing, I think, and you can tell me why I'm wrong. That's why I put it to you. The only evidence you have of a malfunction is the amount of morphine in the tube on the date of death. And that is the most significant. Isn't that the only thing you have? Correct. And there is evidence in this record that there were 30. But there's evidence in this record that there weren't. The official record doesn't support the Hopkins report. No. Rule out the Hopkins report. Forget about the Hopkins report. Then you get back to the issue of removal. And if you were at those depositions, there would be no question. Those witnesses were not being truthful. And there's no documents to support the contention, not a single one. So the most important thing with these machines is how much morphine they deliver. If they deliver the morphine without counting it, there's a problem. It will kill people. All right. I think your time is up. Can I ask one question? Just out of curiosity, have you settled with everybody else involved in this incident? Yes. So this is the only defendant left? That's correct. All right. Thank you both for your vigorous arguments. The matter will now stand submitted.
judges: Farris, Tashima, Callahan